**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMADOR COUNTY, CALIFORNIA, | ) | |
| | ) | Case No. 05-cv-00658 (BJR) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| S.M.R. JEWELL, Secretary of the | ) | |
| UNITED STATES DEPARTMENT OF THE | ) | |
| INTERIOR, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND MEMORANDUM IN SUPPORT/OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 as applied in the context of the Administrative Procedure

Act, 5 U.S.C. §§ 701-706 ("APA"), the United States, by undersigned counsel, files this cross-

motion for summary judgment in opposition to Plaintiff Amador County's motion for summary

judgment. For the reasons set forth in the accompanying memorandum in support of summary

judgment and in opposition to Plaintiff's motion for summary judgment, Plaintiff's motion

should be denied and the United States' cross-motion should be granted on all claims in

Plaintiffs' First Amended Complaint.

TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................... 1

II.    BACKGROUND ......................................................................................................... 2

   A.   Factual Overview .................................................................................................. 2

   B.   Procedural History ............................................................................................... 3

   C.   Statutory Background .......................................................................................... 5
       Appropriation Acts............................................................................................................5
       Indian Reorganization Act ................................................................................................7
       California Rancheria Act and Subsequent Litigation.........................................................7
       Indian Gaming Regulatory Act .........................................................................................9

   D.   Standard of Review ........................................................................................... 11

   E.   Scope of Remand ............................................................................................... 13

   F.   Scope of Administrative Record....................................................................... 13
       Plaintiff's Improper Statement of "Undisputed" Facts and Extra-Record Evidence ....................14

III.   ARGUMENT ............................................................................................................ 18

   A.   The United States is Entitled to Summary Judgment Because the Rancheria is an
       "Indian reservation" as that term is used in IGRA .......................................... 19
      1.  "Indian reservation" as used in IGRA, Requires a Broad Interpretation that Includes Rancherias
         and Other Indian Landholdings...................................................................................19
        a.  IGRA's Language, Policy, and Purpose Support an Expansive Interpretation of "Indian
           Reservation"...........................................................................................................20
        b.  The Established Meaning of Reservation Encompasses Rancherias ......................................21
        c.  Consistent with These Interpretations, Plaintiff Itself has Recognized the Rancheria as a
           Reservation ...........................................................................................................29
      2.  Plaintiff's Attacks on the Rancheria's Reservation Status are Meritless ....................................30
        a.  The 1864 Act has no Bearing on this case ..............................................................................31
        b.  The Appropriation Acts, as Illuminated by the Rancheria Act, Demonstrate that the
           Rancheria was Set Aside as a Reservation...........................................................................32
        c.  The *Hardwick* Judgments Reinstated the Rancheria's Pre-termination Reservation Status ... 34
        d.  Trust Status is not a Requisite of Reservation Status................................................................37
        e.  Plaintiff's injury assertions are improper and irrelevant......................................................38

B.      Even if the Rancheria is not an "Indian reservation" and, thus, not "Indian lands," the
United States is Entitled to Summary Judgment Because IGRA does not Prohibit the Secretary
from Approving a Compact for Land that is not yet Indian Lands. ........................................ 39

C.      Plaintiff's Remedy is Inconsistent with IGRA ............................................................ 41

IV.    CONCLUSION ................................................................................................................. 42

I.      INTRODUCTION

        S.M.R. Jewell, Secretary of the United States Department of the Interior ("Secretary"),

Kevin Washburn, Assistant Secretary Indian Affairs, and the United States Department of the

Interior (collectively, "United States"), respectfully submit this memorandum in support of their

cross-motion for summary judgment and in opposition to Plaintiff Amador County's ("Plaintiff")

motion for summary judgment on its First Amended Complaint.  For the reasons set forth below,

Plaintiff has not met its burden to demonstrate that the Secretary's inaction on the submitted

2004 amendment ("Compact Amendment") to the affirmatively approved 1999 gaming compact

between the Buena Vista Rancheria of Me-Wuk Indians ("Tribe") and the State of California

("State") was "not in accordance with law."  5 U.S.C. § 706(2)(A).  The Secretary's decision to

allow the Compact Amendment to be approved by operation of law ("deemed approved") was in

accordance with the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721.

        Although the procedural history of this case is complex, the questions before this Court

on remand are simple: (1) is the Buena Vista Rancheria ("Rancheria")[1] an "Indian reservation"

as that term is used in IGRA?  If yes, the inquiry is at an end and the United States is entitled to

summary judgment.  If no, (2) may the Secretary approve (either affirmatively or by operation of

law) a compact for Class III gaming on lands that are *not yet* "Indian lands" as defined by IGRA?

If the Secretary may do so, then the United States is entitled to summary judgment.  Only if both

of these questions are answered in Plaintiff's favor is Plaintiff entitled to summary judgment, at

which point the only issue remaining would be the appropriate remedy.

        As in previous rounds of briefing to this Court in 2005 and 2008, Plaintiff persists in

---

[1] Historically, the term "Buena Vista Rancheria" has been used both to refer to the Tribe, and to refer to the Tribe's
reservation.  Here, we use "Tribe" to refer to the Tribe, and "Rancheria" to refer to the reservation.

misconstruing IGRA's "Indian lands" definition in relation to the Rancheria, and in mischaracterizing the Secretary's role under IGRA.  Contrary to Plaintiff's contention, the Rancheria unquestionably is an "Indian reservation" as that term is used in IGRA.  Therefore, it is "Indian lands" within the meaning of IGRA; and even if it is not, IGRA does not require the Secretary to disapprove a compact for gaming on lands that are not yet Indian lands.  Thus, the Court should grant the United States' cross-motion for summary judgment and deny Plaintiff's motion.

II.     BACKGROUND

    A.     Factual Overview

    The D.C. Circuit's decision and remand set forth most of the relevant historical and factual background.[2]  *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 375-77 (D.C. Cir. 2011) ("*Amador Cnty.*").  In brief, the United States purchased and set aside the Rancheria as a reservation in 1926.  The California Rancheria Act ("Rancheria Act") of 1958 authorized the termination of the Rancheria as a reservation and Indian and tribal status of its residents.  In implementing the termination, the United States failed to meet the requirements of the Rancheria Act, as conceded by the United States in *Hardwick v. United States*, No. C-79-1710 (N.D. Cal. 1979).  To remedy its failures, the United States agreed to restore the Tribe's status and reverse the effect of the land distribution.  Thereafter, the federally-recognized Tribe resolved and restored its internal self-governance and later secured ownership of the entirety of its original Rancheria.

---

[2] The United States confines its factual statement to the Administrative Record, the Court record, and those official, judicially noticeable matters material to the Court's consideration of the sole question on remand.  *See Amador Cnty.*, 640 F.3d at 383 (noting that the sole question at issue is "whether the Rancheria qualifies as Indian lands" pursuant to IGRA).

In 1999, pursuant to IGRA, the Tribe and the State negotiated a Class III tribal-state gaming compact ("1999 Compact"), which the Secretary approved effective May 15, 2000.  65 Fed. Reg. 31,189 (May 16, 2000).[3]  Plaintiff and the Tribe subsequently entered into an Intergovernmental Services Agreement ("2001 ISA") to mitigate impacts to the Plaintiff arising from gaming on the Rancheria.  *See generally* Exh. 1.  In 2004, the Tribe and the State negotiated a Compact Amendment.[4]  Plaintiff's claims in this case arise from the Compact Amendment's new section 4.3.5, which states that "the Tribe may operate any and all Gaming Devices only on Indian lands within the boundaries of its Rancheria existing as of July 1, 2004, in Amador County, which rancheria's boundaries is [sic] described in Exhibit D hereto."  Exhibit D to the Compact Amendment sets forth the Rancheria's boundaries by reference to the legal description contained in the 1983 *Hardwick* Judgment.

As required by IGRA, the Compact Amendment was submitted to the Secretary for review, and the Secretary took no action within IGRA's forty-five day review period.  Thus, upon expiration of the review period, the Compact Amendment was deemed approved and, as required by IGRA, the Notice of Approval was published in the Federal Register.  69 Fed. Reg. 76,004 (Dec. 20, 2004); *see also* 25 U.S.C. §§ 2710 (d)(8)(C) and (d)(8)(D).

B.      Procedural History

Despite the Secretary's approval of the 1999 Compact, AR000030; the parties' entry into the 2001 ISA, Exhibit 1; the National Indian Gaming Commission's ("NIGC") approval of the

---

[3] The Tribe's compact followed the model tribal-state compacts approved by California's voters as part of Proposition 1A in 2000 and entered into by the state and over fifty tribes.  Proposition 1A (codified at Cal. Const. Art. IV, § 19(f)) ("Proposition 1A").  The Secretary's Federal Register notice published his approval of those agreements, including the Tribe's compact.

[4] The Compact Amendment increased the number of gaming devices the Tribe could operate in its prospective casino in exchange for increased revenue sharing with the State.  The Compact Amendment also requires that the Tribe identify all potential off-reservation impacts of its proposed gaming facility and then enter into negotiations with Plaintiff to mitigate these impacts to the extent practicable.

Tribe's site-specific gaming ordinance in 2001, *see* Docket No. 33, Attach. B., at 1 n.2; and the

State's further entry with the Tribe into the Compact Amendment in 2004, AR000086; the

Plaintiff sued the United States on April 1, 2005.  Plaintiff requested declaratory and injunctive

relief, including an order requiring the Secretary to withdraw the deemed approval and

disapprove the Compact Amendment on the basis of Plaintiff's theory that the Tribe's land was

not a reservation or "Indian lands" under IGRA.  *See generally* Pl.'s First Am. Compl., Docket

No. 30.

Subsequent to Plaintiff's lawsuit, on June 30, 2005, the NIGC's Office of General

Counsel published an advisory legal opinion ("NIGC Opinion"), in which the Department of the

Interior ("Department") Solicitor's Office concurred, concluding that the Rancheria is IGRA-

qualified "Indian lands."[5]  Docket No. 33, Attach. B.  As the NIGC Opinion points out, in 2001

NIGC had approved and published a site-specific Tribal Gaming Ordinance for the Tribe.  That

approval constituted NIGC's recognition that the Rancheria is "Indian lands."[6]  NIGC Opinion at

1 n.2.  The United States filed motions to dismiss both the original and the first amended

complaints.  The district court granted the latter motion to dismiss, finding that it lacked

---

[5] Such opinion had first been requested by the Tribe in May of 2000, but as explained in the Opinion due to a
leadership dispute within the Tribe, a delay ensued.  The request was renewed in December of 2004.  Notably, by
this point the County itself had urged that an NIGC Opinion be sought.  AR000204.
[6] That Ordinance provided in pertinent part:

    2.37 "Indian Lands" means:
    ***
    2.37.3 Real property consisting of approximately 67.5 acres located in the County
    of Amador, State of California, as more specifically described as follows:
    Property commencing at the Northeast corner of Section 19, Township 5 North, Range 10 East.
    M.D.B & M., and thence running West along Section line 578 feet; thence at right angles South
    5280 feet; thence at right angles East 578 feet; thence at right angles North 5280 feet to a place
    of beginning; and
    2.37.4 Lands that may be acquired by the Tribe that meet the requirements of
    25 U.S.C. Section 2719 et seq.
Tribal Gaming Ordinance of the Buena Vista Rancheria of Me-Wuk Indians (2001), *available at*
http://www.nigc.gov/images/uploads/gamingordinances/bnavstrnchramewukindns-amendappr092501.pdf (last
visited Oct. 22, 2015).

jurisdiction under the APA to review the deemed approval of the Compact Amendment. *Amador Cnty., Cal. v. Kempthorne*, 592 F. Supp. 2d 101 (D.D.C. 2009). Plaintiff appealed, and in May 2011, the D.C. Circuit reversed, holding that the APA did not preclude judicial review of the deemed approval. *Amador Cnty.*, 640 F.3d at 383. The D.C. Circuit remanded to this Court for a determination of the merits of Plaintiff's claim that the Rancheria is not an "Indian reservation." *Id.*[7]

      C.     <u>Statutory Background</u>

<u>Appropriation Acts</u>

      In the early Twentieth Century, Congress enacted remedial legislation to address the unique circumstances of the Indian tribes in California, which had experienced "a catastrophic decline in population following European contact." *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 160 (D.D.C. 2002) (citing S. Rep. 103–340 (1994), *see also City of Roseville v. Norton*, 348 F.3d 1020, 1022 (D.C. Cir. 2003) ("*City of Roseville II*") (affirming, describing history of federally-recognized Auburn Band as having been formed from families of Maidu and Miwok Tribes that managed to survive "the depredation that came with the settlement of California."); *Indians of California by Webb v. United States*, 98 Ct. Cl. 583, 586 (1942).[8] The first of this

---

[7] Thereafter, in November of 2011, the Tribe sought to intervene in order to assert the theory that it was required party under Fed. R. Civ. P. 19 and that the case must be dismissed because, as a sovereign, it could not be involuntarily joined. This Court denied that motion, Docket No. 65, and the D.C. Circuit affirmed. *Amador Cnty., Cal. v. U.S. Dep't of the Interior*, 772 F.3d 901 (D.C. Cir. 2014).

[8] *See* Cohen's Handbook of Fed. Indian Law at § 1.03[5], 58-59, (2012):

As a result [of rapid non-Indian settlement due to the discovery of gold in California], Congress appropriated $25,000 and dispatched commissioners to obtain the lands of California Indians by treaty. In 1851, federal agents negotiated many treaties with California tribes, each providing for the surrender of native land holdings in return for small plots of land elsewhere. The treaties also contained stipulations subjecting the Indian tribes to state law… [T]he California state legislature formally protested assignment of any new lands to Indians. Consequently, the United States Senate rejected the treaties on July 8, 1852. The Indian tribes, however, had already begun performance of their part of the agreement. Urged by government officials to anticipate Senate approval, they had started the journey to the proposed reservations. The tribes had surrendered their homes with no place to go. The federal government showed little willingness to take action, and the tribes became landless. Eventually several small reservations were created for the use of the California Indians.

legislation was the Indian Appropriation Act of 1905, which called for an investigation into "the

existing conditions of the California Indians" and a report back to Congress with "some plan to

improve the same."  Act of March 3, 1905, 33 Stat. 1048, 1058.  Attorney C.E. Kelsey,

commissioned by the United States Indian Office to undertake that report, found that the Indians

"had been forced from agriculturally productive lands and were then living on worthless lands in

distressing conditions," and recommended to the Commissioner of Indian Affairs

("Commissioner") that the government undertake to purchase private lands for their benefit, use

and occupancy.  *Duncan v. Andrus*, 517 F. Supp. 1, 2 (N.D. Cal. 1977).  Kelsey's report resulted

in the Act of June 21, 1906, 34 Stat. 325, 333 ("1906 Act"), which appropriated $100,000 and

authorized the Department to "purchase for the use of the Indians of California now residing on

reservations which do not contain land suitable for cultivation, and for Indians who are not now

upon reservations in said State, suitable tracts or parcels of land, water, and water rights in said

State . . . as the Secretary of the Interior may deem proper."  *Id*. (citing 1906 Act).

Pursuant to the 1906 Act, "and under subsequent acts to implement Kelsey's original

scheme," *Duncan v. Andrus*, 517 F. Supp. at 2,[9] rancherias were purchased in Northern and

Central California for California Indians.[10]  In 1927, the United States purchased 67.5 acres of

land within Amador County, California which the D.C. Circuit described as "held it in trust for

---

[9] *See also* Act of Apr. 30, 1908, 35 Stat. 70, 76 ("1908 Act") (same, appropriating $50,000); Act of Aug. 1, 1914, 38 Stat. 582, 589 ("1914 Act") (appropriating $10,000 to purchase lands and improvements thereon "for the use and occupancy" of "homeless Indians of California"); Act of May 18, 1916, 39 Stat. 123, 132 (same); Act of Mar. 2, 1917, 39 Stat. 969, 975 (same, appropriating $20,000); Act of May 25, 1918, 40 Stat. 561, 570 (same); Act of June 30, 1919, 41 Stat. 3, 12 (same); Act of Feb. 14, 1920, 41 Stat 408, 417 (same, appropriating $10,000); Act of Mar. 3, 1921, 41 Stat. 1225, 1234 (same); Act of May 10, 1926, ch. 277, 44 Stat. 453, 461 (same, appropriating $7,000); Act of Jan. 12, 1927, 44 Stat. 934, 941 (same); Act of Mar. 7, 1928, 45 Stat. 200, 206 (same, appropriating $4,000); Act of Mar. 4, 1929, 45 Stat. 1562, 1568 (same, appropriating $8,000) (collectively, "Appropriation Acts").
[10] *See also Williams v. Gover*, 490 F.3d 785, 787 (9th Cir. 2007) ("'Rancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization) for Indian use from time to time in the early years of [the twentieth] century – a program triggered by an inquiry (in 1905-06) into the landless, homeless, or penurious state of many California Indians.'") (quoting *Duncan v. United States*, 229 Ct. Cl. 120, 667, F.2d 36, 38 (1981)) (parentheticals in original; alteration in *Williams*).

the Tribe's use." *Amador Cnty.,* 640 F.3d at 375.

Indian Reorganization Act

In 1934, Congress enacted the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 461-494a, to, *inter alia*, encourage tribes "to revitalize their self-government" and to take control of their "business and economic affairs." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151 (1973). Congress sought to "establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1974).

Of particular relevance here is IRA's mandate in Section 18 that the Secretary hold elections to give adult Indians residing *on reservations* the opportunity to opt out of the IRA altogether. 25 U.S.C. § 478 (IRA "shall not apply to any reservation wherein a majority of the adult Indians . . . shall vote against its application," and requiring the Secretary to hold such an election). Such elections were held at dozens of California rancherias, including Buena Vista, demonstrating that the Secretary viewed the Rancheria as a reservation for purposes of IRA. *See* Theodore H. Haas, *Ten Years of Tribal Government Under I.R.A.*, U.S. Indian Service Tribal Relations Pamphlets 1 (1947) at 14-16 ("Haas Report").[11]

California Rancheria Act and Subsequent Litigation

In 1958 Congress enacted the Rancheria Act. Act of Aug. 18, 1958, 72 Stat. 619, *amended by* 78 Stat. 390 (1964). Reflecting the termination era and its focus on assimilating Indians, the Rancheria Act "authorized the Secretary to terminate the federal trust relationship with several California tribes, including the Me-Wuk Tribe, and to transfer tribal lands from federal trust ownership to individual fee ownership." *Amador Cnty.*, 640 F.3d at 375. As

---

[11] *Available at* https://www.doi.gov/sites/doi.gov/files/migrated/library/internet/subject/upload/Haas-TenYears.pdf (last visited Oct. 22, 2015).

consequence of the Rancheria Act, title to the 67.5 acre Rancheria was distributed in fee to two Buena Vista members as joint tenants, *id.*, and "the land was stripped of its reservation status." *Id.* at 383.

In 1979, however, Indian residents of California rancherias, including the Buena Vista Rancheria, filed a class action lawsuit against the United States and the California counties, including Amador County, in which the rancherias were located. *See generally Hardwick v. United States*, No. C-79-1710 (N.D. Cal. 1979). Arguing that termination of their rancherias was unlawful because it had not been conducted in accordance with the Rancheria Act, the plaintiff class sought to restore the reservation status of their lands and to remedy the consequences of the invalid jurisdictional shift that had resulted in the respective counties' asserting regulatory authority over the rancherias. The lawsuit sought to halt and reverse the deleterious effects of the Rancheria Act by "unterminat[ing]" the rancherias such that the United States and counties would be required to "treat the Rancherias as reservations in all respects." Pl.'s Original Compl., 27, *Hardwick v. United States*, No. C-79-1710 (N.D. Cal. 1979); *see also* NIGC Opinion at 3.

In July 1983, the United States settled with the *Hardwick* plaintiff class, and that settlement was entered as a judgment in December of 1983. *Hardwick*, Stip. Entry J., Docket. No. 59,[12] Exh. 1 ("1983 *Hardwick* Judgment"). The Judgment required that the United States restore the individual plaintiffs to their Indian status and restore their former collective status through inclusion on the Secretary's Federal Register list of recognized tribal entities. *Id.* at ¶¶ 3, 4. It also provided that the Rancheria Act land distribution plans for the Rancherias listed in Exhibit A to the Stipulation "shall be of no further force and effect and shall not be further implemented." *Id.* at ¶ 10. The court retained jurisdiction to confirm in "further proceedings"

---

[12] All citations to the Docket, including those associated with *Hardwick*, are to the Docket in *this* case unless otherwise indicated.

the scope of the boundaries of the seventeen un-terminated rancherias, the legal descriptions of

which, including that of the 67.5 acre Buena Vista Rancheria, were listed in Exhibit A. *Id*. at ¶ 5.

In accordance with the 1983 *Hardwick* Judgment, the Buena Vista Tribe was included on

the Secretary's official 1985 Federal Register list of recognized tribes.  50 Fed. Reg. 6,055 (Feb.

13, 1985).  Thereafter, in April of 1987, and after first and second amended complaints were

filed in the *Hardwick* litigation, Amador County and the Buena Vista members of the plaintiff

class reached the separate settlement anticipated by the 1983 *Hardwick* Judgment.  *Hardwick*,

Stip. Entry J. (Amador County), Docket No. 33, Attach. A ("1987 *Hardwick* Judgment").

Indian Gaming Regulatory Act

IGRA was enacted in the wake of the Supreme Court's decision in *California v. Cabazon

Band of Mission Indians*, 480 U.S. 202 (1987), in which the Court held that state laws

*prohibiting* gaming served also to prohibit gaming on Indian reservations within the state, but

that state laws *regulating* gaming could not be enforced on Indian reservations without

Congress's express consent.  *Id.* at 207-10, 221-22.  Because federal law at that time did not

"provide clear standards or regulations for the conduct of gaming on Indian lands," 25 U.S.C. §

2701(3), *Cabazon* left Indian gaming free of federal or state regulation.  In response, Congress

enacted IGRA to, *inter alia*, establish a comprehensive regulatory structure for Indian gaming

and "provide a statutory basis for the operation of gaming by Indian tribes as a means of

promoting tribal economic development, self-sufficiency, and strong tribal governments."  25

U.S.C. § 2702(1); *see Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2043 (2014)

(Sotomayor, J., concurring) (noting the importance of tribal gaming operations to "core

governmental functions" especially in light of "the insuperable (and often state-imposed) barriers

Tribes face in raising revenue through more traditional means").

IGRA divided gaming into three classifications, with casino-style gaming designated as

"Class III,"[13] and provided that a tribe could enter a compact with a state for the operation of Class III gaming on "Indian lands" governed by the Tribe.  *See generally* IGRA, 25 U.S.C. §§ 2701-2721.  If a state and tribe reach agreement on a compact, the compact is submitted to the Secretary who must approve or disapprove the compact within forty-five days, otherwise it is deemed approved "to the extent [it] is consistent" with IGRA.  § 2710(d)(8)(C).  The Secretary may disapprove a compact only if it violates IGRA, other provisions of federal law, or the United States' trust obligations to Indians.  § 2710(d)(8)(B).  A compact, if approved or deemed approved, takes effect when notice of such approval is published in the Federal Register pursuant to § 2710(d)(3)(B) of IGRA.

IGRA applies only to federally recognized tribes, 25 U.S.C. § 2703(5), such as the Tribe here, and governs gaming on "Indian lands," which are defined, *inter alia*, to include "all lands within the limits of any Indian reservation." 25 U.S.C. § 2703(4)(A).[14]  In 2001, Congress clarified that "[t]he authority to determine whether a specific area of land is a 'reservation' for purposes of [IGRA], was delegated to the Secretary of the United States Department of the Interior on October 17, 1988 . . . ."  Pub. L. No. 107–63, § 134 (2001), 115 Stat. 414 ("Congressional Clarification"); *see also City of Roseville II* 348 F.3d at 1029 (affirming the Secretary's authority to determine whether land is a "reservation" for purposes of IGRA).

The Department later promulgated regulations defining reservation to implement a section of IGRA.  Those regulations define reservation to include, *inter alia*, "[l]and of Indian colonies and rancherias (*including rancherias restored by judicial action*) set aside by the United

---

[13] 25 U.S.C. § 2703(8) (defining "class III gaming" as "all forms of gaming that are not class I gaming or class II gaming"); *see also id.* at 2703(6)-(7) (defining "class I gaming" and "class II gaming").

[14] The definition of "Indian lands" also includes lands the title to which is held by the United States either in trust, or in fee restricted from alienation, for the benefit of an Indian tribe or an individual Indian, and over which the tribe exercises governmental power.  25 U.S.C. § 2703(4)(B).  In this case, "because the parties agree that the Rancheria is owned in fee by the Tribe rather than held in trust by the United States, it appears that the land can qualify as 'Indian land' only if it is an 'Indian Reservation.'"  *Amador Cnty.*, 640 F.3d at 383.

States for the permanent settlement of the Indians as its homeland."  25 C.F.R. § 292.2 (emphasis added).

D.    Standard of Review

Seeking to set aside the Secretary's December 20, 2004, deemed approval of the Compact Amendment, Plaintiff sued pursuant to the APA, which provides the only waiver of United States' sovereign immunity applicable to this case.  5 U.S.C. § 702.  A court may set aside agency action only where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  This standard encompasses a presumption in favor of the validity of agency action.  "The ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *see also Small Refiner Lead Phase-Down v. EPA*, 705 F.2d 506, 520-21 (D.C. Cir. 1983); *Confederated Tribes of the Grand Ronde Cmty. v. Jewell*, 75 F. Supp. 3d 387, 396-7 (D.D.C. 2014) ("*Grand Ronde*").

Claims brought pursuant to the APA are appropriately decided on summary judgment based upon the administrative record that existed at the time of the agency's decision, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985), and, in the remand of the instant case, judicially noticeable matters from the public record that are material to this Court's consideration of the legal question to be determined.[15]  In reviewing final agency action under

---

[15]  *See, e.g. Pharm. Research & Manufacturers of Am. v. United States Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33-34 (D.D.C. 2014) (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on the District of Columbia's Retirement Board website); *Carik v. Dep't Health & Human Servs.*, 4 F. Supp. 3d 41, 48 n.4 (D.D.C. 2013) (taking judicial notice of information on the FDA's website); *Hyson v. Architect of Capitol*, 802 F. Supp. 2d 84, 90–91 n.4 (D.D.C. 2011) (taking judicial notice of description on U.S. Office of Personnel Management's website)); *Koretoff v. Vilsack*, 841 F. Supp. 2d. 1, at 17 n.21 (D.D.C. 2012) (citing 44 U.S.C. § 1707); *Am. Farm Bureau v. U.S. EPA*, 121 F. Supp. 2d 84, 105-6 (D.D.C. 2000).
   Moreover, the Supreme Court has recognized the importance of historical context when interpreting statutes enacted by Congress to regulate Indian affairs.  *Mattz v. Arnett*, 412 U.S. 481, 485 (1973).  Federal courts may take judicial notice of reports, filed by committees of Congress and other legislative history.  *Territory of Alaska v. Am.*

the APA, "the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." *Pub. Employees for Envtl. Responsibility v. DOI*, 832 F. Supp. 2d 5, 15 (D.D.C. 2011).  The court does not resolve factual issues, but instead determines whether, as a matter of law and based on the administrative record, the agency was permitted "to make the decision it did."  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d. 766, 769 (9th Cir. 1985)). Hence, the APA standard and *not* the summary judgment standard applies here, even though the United States moves under Federal Rule of Civil Procedure 56 for summary affirmance of the Secretary's decision based upon the AR and matters of public record germane to the remand question.  *See, e.g.*, *Jackson v. Mabus*, 56 F. Supp. 3d 1, 7 (D.D.C. 2014).

A reviewing court should accord deference to agency interpretation and implementation of statutes the agency is charged with administering.  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *see also Skidmore v. Swift*, 323 U.S. 134, 139 (1944) (noting deference due agencies based on their "specialized experience and broader investigations and information").  This principle is especially true where, as here, Congress has expressly delegated to the agency authority to interpret the statute.  *See* Congressional Clarification.

Finally, when interpreting a statutory provision implicating Indian affairs, "the governing canon of construction requires that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Grand Ronde*, 75 F. Supp. 3d at 396

---

*Can Co.*, 358 U.S. 224, 226-27 (1959) (taking judicial notice of statute's legislative history); *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1988) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper" (citing *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986))).

(quoting *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008)).

E.   Scope of Remand

This Court's review is governed not only by the standards set forth in the APA, but also by the D.C. Circuit's unique and narrow remand.  The D.C. Circuit found that the Secretary's inaction within the forty-five day period provided by IGRA is a reviewable action under the APA, *Amador Cnty.*, 640 F.3d at 383, but also found that Plaintiff had waived his arguments that the deemed approval was arbitrary and capricious: "Amador County alleges *not* that the Secretary's decision was unreasoned but that his decision was 'contrary to law.'  Because of the nature of this particular challenge, *we need no agency reasoning*."  *Id.* at 382 (emphasis added, internal citation omitted).[16]  Thus, the case was remanded to this Court to address the "sole legal question at issue" – whether the Buena Vista Rancheria is a reservation as that term is used in IGRA, and thus qualifies as "Indian lands."  *Id.* at 383.

F.   Scope of Administrative Record

Because Plaintiff no longer challenges the process or reasoning for the deemed approval, but instead claims only that the deemed approval was "not in accordance with" IGRA, the AR of the forty-five days before the Compact Amendment was deemed approved is not particularly assistive to the Court's task on remand.[17]  While IGRA does not require the Secretary to

---

[16] In addition, the D.C. Circuit noted that Plaintiff had waived its argument that the Compact Amendment was void *ab initio* on state law grounds, *id.* at 377, and Plaintiff does not argue them in its present motion.  *See Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 83 (D.D.C. 2013) (claims in complaint abandoned when not raised in summary judgment briefs); *Noble Energy, Inc. v. Salazar*, 691 F. Supp. 2d 14, 23 (D.D.C. 2010) (same).

[17] However, because the D.C. Circuit held that deemed compact approvals are subject to judicial review under the APA, Interior's policy in this Circuit has been to lodge the forty-five day administrative records of challenged deemed approvals.  Further, prior to compilation of the AR it was not known whether or to what extent the Department had considered (or assumed) the Indian lands status of the Rancheria.

The AR does, however, establish the agency's compliance with IGRA's dictates regarding Secretarial review of Tribal-State gaming compacts submitted for approval.  The AR here demonstrates that the Secretary was intensely focused on ensuring the fairness of the Compact Amendment's financial terms for the Tribe and was not, as suggested by Plaintiff, engaged in a cavalier review.  Pl.'s Mem. Supp. Summ. J., 6.  *See* AR000154, Letter from George T. Skibine ("Mr. Skibine"), Acting Deputy Ass't Sec'y—Policy and Econ. Dev., to Hon. Rhonda L.

undertake an Indian lands determination within the short forty-five day review period,[18] it does

dictate that the Secretary may disapprove compacts only on a finding that the terms of the

compact violate IGRA, other federal law, or the United States' trust obligations. 25 U.S.C. §

2710(d)(8)(B).  Section 4.3.5 of the Compact Amendment authorizes gaming only on "Indian

lands" within the boundaries of the Rancheria and, thus, presented no facial inconsistency with

IGRA.[19]  The AR also demonstrates that the Department was aware that the Tribe was among

those whose rancherias were restored as a result of the *Hardwick* litigation.  AR000184, at 185,

Email from Mr. Skibine to Ms. Blackwell (Oct. 18, 2004) ("Edith: turns out that Buena Vista is a

Tillie Hardwick tribe.").[20]  The AR contains no evidence whatsoever that the past or present

status of the Tribe's Rancheria might disqualify the Rancheria from gaming under IGRA.

Plaintiff's Improper Statement of "Undisputed" Facts and Extra-Record Evidence

      Because the APA restricts judicial review of agency action to "the whole record or those

parts of it cited by a party," 5 U.S.C. § 706, extra-record documents not subject to judicial notice

should not be considered.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for

judicial review should be the administrative record already in existence, not some new record

---

Morningstar Pope, Chairperson, Buena Vista Band of Me-Wuk Indians (Oct. 8, 2004) (requesting justification for Compact Amendment's revenue-sharing provisions); AR000184, Email from Mr. Skibine to Edith Blackwell ("Ms. Blackwell"), Assoc. Solic.—Indian Affairs (Oct. 18, 2004) (Department "will complete our economic analysis tomorrow, depending on when we get the State's response"); AR000118, Letter from Counsel to the Tribe to Mr. Skibine (Oct. 19, 2004) (responding to request for justification); AR000193, Letter from Counsel to the State to Mr. Skibine (Oct. 19, 2004) (same).

[18] *See infra* at 39, 40.

[19] Section 4.3.5 of the Compact Amendment, addressed to where the Tribe may operate gaming devices, states that such operation may only occur on Indian lands within the boundaries of the Rancheria as it existed on July 1, 2004. AR000091.

[20] The Compact Amendment, too, specifically invokes *Hardwick*.  Section 4.3.5 refers to Exhibit D, which sets forth the boundaries "as described in the Stipulation for the Entry of Judgment in *Tillie Hardwick et al. v. United States of America*, No. C-79-170-SW."  This is the very judgment through which the United States admitted that it had failed to fulfill its pre-termination Rancheria Act responsibilities, and had bound itself to "un-termination" of the Rancheria and further boundary confirmation proceedings.  Thus, it is reasonable to infer that the reservation and IGRA "Indian lands" status was assumed.

made initially in the reviewing court.").  Contrary to the Local Rules[21] and practice in this

district, Plaintiff has included a "Statement of Undisputed Facts."  Virtually all of the facts set

forth in that statement are either *entirely new factual assertions* not contained in Plaintiff's First

Amended Complaint,[22] or are *disputed* in the United States' Answer[23] and, therefore, should not

be considered for purposes of summary judgment.

Ignoring limitations on APA review, Plaintiff now seeks to introduce into evidence

statements of Stephen Dow Beckham contained within his Declaration, Docket No. 76-2

("Beckham Declaration"), and his Report, Docket No. 76-3 ("Beckham Report") (together

"Beckham Materials"), which post-date the challenged agency action and are not properly before

the Court.  *See Kan. Health Policy Auth. v. HHS*, 798 F. Supp. 2d 162, 168 (D.D.C. 2011)

("[J]udicial review is confined to the full administrative record before the agency at the time the

decision was made.").  The Beckham Materials are dated after the Compact Amendment was

deemed approved and, therefore, the Beckham Materials cannot come before the Court as

---

[21] *See* Local Civil Rule 7(h)(2) ("Paragraph (1) *shall not apply* to cases in which judicial review is based solely on the administrative record. In such cases, motions for summary judgment and oppositions thereto shall include a statement of facts with references to the administrative record.") (emphasis added). Here, the unique nature of the D.C. Circuit's decision and remand necessitates that the Court consider, in addition to the AR, the court record of prior proceedings and judicially noticeable matters that elucidate whether the Rancheria is an "Indian reservation" as that term is used in IGRA.  Plaintiff has made no showing, and there is no reason, why the Court should generally consider extra-record evidence.

[22] For example, the First Amended Complaint nowhere identifies the particular appropriation statute that was the source of funds for purchase of the Rancheria.  *See generally* Pl.'s First Am. Compl., Docket. No. 30.  Thus, Plaintiff's assertions related to the 1914 Act, *see* Pl.'s Mem. Supp. Summ. J., 7 ¶¶ 1, 3-4; 14 ¶¶ 45-46, are asserted here for the first time, and cannot be "undisputed."  Similarly, before filing its summary judgment motion, Plaintiff never so much as disclosed that it had retained and commissioned a report from its "expert ethnohistorian" Stephen Dow Beckham, much less disclosed the contents of said report; thus, Plaintiff's factual assertions that are drawn from the Beckham Declaration and/or the Beckham Report, *id.* at 7-9 ¶¶ 2, 5-16; at 11 ¶ 23-24, 26, cannot be "undisputed."

[23] *E.g., compare* Pl.'s Mem. Supp. Summ. J., 8 ¶ 7 ("There is no evidence that any Indians resided on the Rancheria between 1927 and 1930."), *with* Pl.'s First Am. Compl. ¶ 33 ("Between 1927 and 1930, there is no evidence that any Indians resided on the Buena Vista Rancheria."), *and* Answer ¶ 33 ("Federal Defendants deny the allegations in Paragraph 33 of the Complaint."); *compare* Pl.'s Mem. Supp. Summ. J., 8 ¶ 8 ("There is no evidence that Louis and Annie Oliver or any of their descendants resided on the Rancheria between the time of 1927 (the time of land purchase) and 1935, and, to the contrary, there is evidence that they did not."), *with* Pl.'s First Am. Compl. ¶ 34 ("Between 1927 and 1935, there is no evidence that Louis and Annie Oliver, or any member of their family, resided on the Buena Vista Rancheria."), *and* Answer ¶ 34 ("Federal Defendants deny the allegations in Paragraph 34 of the Complaint.").

supplementation of the AR.  *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2010) ("supplementing the record [means] adding to the volume of the administrative record with *documents the agency considered*" (emphasis added)). The Beckham Materials also cannot come before the Court under the exception that allows for consideration of extra-record evidence, an exception that "the D.C. Circuit has cautioned . . . [is] 'narrow' and that, 'at most . . . may be invoked to challenge gross *procedural* deficiencies." *Tindal v. McHugh*, 945 F. Supp. 2d 111, 124 (D.D.C. 2013) (emphasis added) (quoting *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013)).  Here, Plaintiff has abandoned its claims of procedural irregularity, and the D.C. Circuit has determined that the process by which the Compact Amendment was deemed approved is not at issue – the only issue is whether that deemed approval is contrary to IGRA.  *Amador Cnty.*, 640 F.3d at 382.  Thus, consideration of the Beckham Materials would be inappropriate in this case.[24]

        In addition, the "facts" alleged in the Beckham Materials are immaterial to the Court's determination of whether Rancheria is an "Indian reservation" for purposes of IGRA.  Mr. Beckham's central conclusion is that there is no historical evidence of any "tribal presence" on

---

[24]  Even if this case was one where consideration of non-judicially noticeable extra-record evidence was proper, the Beckham Materials must be excluded because of Plaintiff's failure to make disclosures required by Rule 26(a) of the Federal Rules of Civil Procedure.  "Under Rule 26, the party presenting *any* expert testimony must satisfy several prerequisites, including disclosure of the identity of the witness offering expert testimony."  *Daniels v. Dist. of Columbia*, 15 F. Supp. 3d 62, 68 (D.D.C. 2014) (citing Fed. R. Civ. P. 26(a)(2)(A)) (emphasis in original). The Beckham Report was completed in 2007, *see* Beckham Report at cover page, and the parties have had numerous discussions concerning the status of this case since then.  Nonetheless, Plaintiff *never once* disclosed the report – or even its intention to file such a report – before filing it as an exhibit to its summary judgment motion.

    In addition, Mr. Beckham is a retained expert, Beckham Decl. at ¶¶ 1-2 (stating that he researched and wrote the Beckham Report at Plaintiff's request and that Plaintiff had "retained" his services); however, the Beckham Report does not satisfy the minimum requirements for retained experts' reports set forth in Rule 26(a)(2)(B)(ii).  "Rule 26(a)(2) specifically contemplates exclusion of reports, such as this one, that are filed too late to provide the opposing party with an adequate opportunity to respond . . . ."  *Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005).  In fact, under Rule 37(c)(1), exclusion of a witness who was not properly disclosed in accordance with Rule 26(a) "is 'automatic and mandatory unless the party to be sanctioned can show that its violation . . . was either [substantially] justified or harmless.'"  *Elion v. Jackson*, 544 F. Supp. 2d 1, 6 (D.D.C. 2008) (quoting *NutraSweet Co. v. X-L Eng'rg Co.*, 227 F.3d 776, 785-86 (7th Cir. 2000)) (alteration in *Elion*).  Thus, Rule 37(c)(1) requires exclusion of the Beckham Materials unless Plaintiff can demonstrate substantial justification for the eight-year delay in disclosure or that such delay did not harm the United States.

the Rancheria.  *See* Beckham Decl. at ¶ 5 (explaining centrality of "element of 'tribal presence'

as ethnohistorians understand it" to his investigation); Beckham Report at 14-17 (asserting that

documents reviewed "fail to document any measures of tribal presence").  However, the

Beckham Materials *do not* demonstrate (nor does any other evidence offered by Plaintiff) that

any "element of 'tribal presence' as ethnohistorians understand it" was required by Congress as it

used the word "reservation" *in IGRA*.  Thus, the Beckham Materials are immaterial to

determination of the legal issue in this case, and cannot serve as the basis for summary judgment.

       Finally, the only conclusion asserted in the Beckham Declaration that *is* relevant to the

issue remanded to this Court – whether the Rancheria is an "Indian reservation" as that phrase is

used in IGRA – is actually contradicted by the material included in the Beckham Report.  In his

Declaration, Mr. Beckham describes the records he claims to have reviewed, Beckham Decl. at ¶

4, and asserts that "none of them identified the Rancheria as an Indian reservation."  *Id.* at ¶ 6;

*see also* Beckham Report at 14 ("There is no record that the Bureau of Indian Affairs ever

designated the Buena Vista Rancheria a reservation.").  However, according to his Report, the

document that Mr. Beckham describes as "the most detailed information about the [R]ancheria,"

Beckham Report at 3 (describing Hill & Brodhead report for Bureau of Indian Affairs ("BIA")),

describes the Rancheria as a "reservation" at least four times.[25]  The Beckham Materials

effectively dispute themselves, and therefore cannot be "undisputed evidence" to support

summary judgment.

       Under the unique remand from the D.C. Circuit, this Court is tasked with making an APA

---

[25] Beckham Report at 3 ("The *reservation* is occupied by two families" (emphasis added)) (quoting Hill &
Brodhead); *id.* ("The *reservation* is a narrow strip . . ." (same)); *id.* ("A few head of cattle were inside the
*reservation*" (same)); at 4 (recommending "[t]hat no improvements be undertaken on the *reservation*") (same)).  *See
also id.* at 4, 9 (seeking clarification of "mineral rights of the *reservation*" (emphasis added)) (quoting 1955 BIA
Work Sheet)).

determination as to whether the deemed approval of the Compact Amendment was contrary to law.  According to the D.C. Circuit, that determination turns upon whether the Rancheria is an "Indian reservation" and thus qualifies as "Indian lands" under IGRA, *Amador Cnty*. 640 F.3d. at 384. That determination is a matter of statutory construction, agency interpretation and practice, and interpretation of the plain language of the entered judgments in the *Hardwick* litigation, set against the backdrop of a substantial body of relevant case law – all of which implicates only matters of public record.

III.     ARGUMENT

Plaintiff's challenge turns entirely on the theory that the Buena Vista Rancheria is not an "Indian reservation" as that term is used in IGRA.  Pl.'s Mem. Supp. Summ. J., 5-6.  Contrary to Plaintiff's contentions, the term "reservation" in IGRA encompasses the Rancheria.  The express purpose and legislative history of IGRA support this interpretation, as does the canon of construction applicable to statutes enacted for the benefit of Indians, the Department's consistent policy, and related case law.  Plaintiff's narrow reading finds no support in IGRA, its legislative history, or the law.  Moreover, nothing requires that the Rancheria be held in trust to qualify as a reservation.  Plaintiff may be opposed to Indian gaming, but that battle has been fought, IGRA is the result, and there are now class III gaming compacts in effect between the State and over sixty tribes in California based upon State voters' ratification of Proposition 1A in 2000.  Plaintiff may seek to protect its interests through the mitigation opportunities afforded by the Compact (Plaintiff, in fact did so) and subsequent Compact Amendment;[26] however, Plaintiff should not be allowed to persist in attacking the Tribe's legitimacy and the reservation status of its

---

[26] After the Compact Amendment was deemed approved, Plaintiff eschewed its opportunity to enter an updated Intergovernmental Services Agreement, and such agreement ultimately was entered upon judgment in arbitration. Docket No. 40-1.

Rancheria.

    A.    The United States is Entitled to Summary Judgment Because the Rancheria is an "Indian reservation" as that term is used in IGRA

As set forth above, because the parties agree upon the sole question at issue – whether the Rancheria is an "Indian reservation" as that term is used in IGRA – this Court's task is to determine what Congress meant when it used the phrase "Indian reservation."

    1.    "Indian reservation" as used in IGRA, Requires a Broad Interpretation that Includes Rancherias and Other Indian Landholdings

In this Circuit, when a court endeavors to determine what Congress meant in using a term within a statute, it must examine the statute's text, the term's context within the statute, and the statute's structure.  *See City of Roseville II*, 348 F.3d at 1025.  Since Congress did not specifically define "Indian reservation" in IGRA, and the Department's regulations further defining reservation were not yet in force when the deemed approval of the Compact Amendment occurred in 2004,[27] this Court must assume that "Congress intended 'to incorporate the established meaning of the term.'"  *Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1266 (10th Cir. 2001); *see also Arizona Pub. Serv. Co. v. E.P.A.*, 211 F.3d 1280, 1292 (D.C. Cir. 2000) ("Significantly, the Act nowhere defines 'reservation.'  Therefore, we look to the term's ordinary and natural meaning, and the context in which the term is used.") (citing *Smith v. United States*, 508 U.S. 223, 228-30 (1993)).  "[T]he Indian canon of statutory construction requires the court to resolve any doubt in favor of the" tribe.  *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 471 (D.C. Cir. 2007).  Accordingly, any ambiguity in the language of IGRA should be liberally construed in a manner that is most favorable to tribal

---

[27] Nonetheless, the fact that the definition that the Department formally adopted in 2008 is consistent with the Secretary's deemed approval *is* of relevance to this Court's determination of whether the deemed approval was "contrary to" IGRA.  *See infra* at 23-24.

interests.  *Michigan Gambling Opposition v. Norton*, 477 F. Supp. 2d 1, 8 (D.D.C. 2007)

(accepting the agency interpretation of the term "reservation" in IGRA), *aff'd on other grounds*

*sub nom. Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008).

a.  <u>IGRA's Language, Policy, and Purpose Support an Expansive Interpretation of "Indian Reservation"</u>

Congress included the word "reservation" seven times in IGRA,[28] but did not define the

term.  However, consideration of IGRA in its entirety strongly suggests that Congress used

"Indian reservation" as a broad, inclusive term that would encompass not only formally

designated Indian reservations, but also rancherias, pueblos, colonies, dependent Indian

communities, and other types of recognized Indian settlements.  In enacting IGRA, Congress

recognized that "a principal goal of Federal Indian policy is to promote tribal economic

development, tribal self-sufficiency, and strong tribal government."  25 U.S.C. § 2701(4).  In

addition, Congress declared that one purpose of IGRA was "to provide a statutory basis for the

operation of gaming by Indian tribes as a means of promoting tribal economic development, self-

sufficiency, and strong tribal governments."  *Id.* at § 2702(1).  These broad policy goals

necessarily include rancherias within their ambit.  An interpretation of "Indian reservation" that

excludes rancherias and other settlements not formally designated as "reservations" would

frustrate IGRA's stated goals, and would dramatically disadvantage tribes whose landholdings

are not formally designated as "reservations."[29]

---

[28] The term "Indian reservation" appears in the definition of "Indian lands," 25 U.S.C. § 2703(4), and six more times within 25 U.S.C. § 2719, which prohibits gaming on lands acquired after IGRA's enactment except in accordance with certain enumerated exceptions.

[29] IGRA's legislative history provides even better evidence that Congress used the term "Indian reservation" to encompass a wide variety of Indian tribal landholdings.  During the Senate floor debate, Senator Inouye strongly implied that the term "Indian reservation" encompassed a tribe's primary landholdings, while the trust and restricted fee lands described in Section 2703(4)(b) were included to bring in lands outside of the tribe's primary landholdings. 134 Cong. Rec. 24016, 24024 (Sept. 15, 1988) ("the definition of 'Indian lands' . . . includes all lands within the limits of any reservation and those trust or restricted fee lands *outside the reservations* (statement of Mr. Inouye)

Further, construing IGRA in a manner that would disallow gaming on the Rancheria is contrary to the Indian canon requiring that statutes be read to favor the tribe's interests, including their economic interests. *Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387, 396 (D.D.C. 2014) ("when interpreting an ambiguous statutory provision involving Indian affairs, 'the governing canon of construction requires that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"). Thus, interpreting "reservation" more narrowly than its established meaning, as Plaintiff urges, would undermine Congress's goal of promoting tribal economic development through IGRA. 25 U.S.C. § 2701(4), § 2702(1); *see also City of Roseville II*, 348 F.3d at 1030 (refusing to narrowly interpret an IGRA term in a manner contrary to IGRAs purpose of "promoting tribal economic development" and "self-sufficiency," and finding that participation in tribal gaming is consistent with that purpose).

b.   The Established Meaning of Reservation Encompasses Rancherias

The past practice of Congress, as it relates to California rancherias and in general, demonstrates that rancherias are encompassed within the meaning of the term "Indian reservation." Lands purchased and set aside for California Indians pursuant to the Appropriation Acts were, for all intents and purposes, Indian reservations. The 1906 Act and the 1908 Act, which began the multi-year federal purchase and set aside of the California rancherias, both used the term "reservation" in connection with planning those purchases. Although subsequent Appropriation Acts did not specifically use the word "reservation," these Acts were merely

---

(emphasis added)). Consistent with that sentiment, the word "reservation" is used in a broad, inclusive manner in both the Senate Report on the IGRA, S. Rep. 110-446, and the House floor debate. 134 Cong. Rec. 25369-81 (Sept. 26, 1988). Meanwhile, neither the Senate Report nor either of the floor debates, *see also* 134 Cong. Rec. 24016-37 (Sept. 15, 1988) (Senate floor debate), contains even a single use of the words "rancheria," "colony," or "dependent Indian community," suggesting that Congress made no attempt to distinguish formally declared "reservations" from other types of Indian settlements.

extensions of the policy and process that began with the 1906 Act[30] and, therefore, all of the

Appropriation Acts should be read *in pari materia* and construed together.  *See Branch v. Smith*,

538 U.S. 254, 281 (2003) (the meaning of earlier statutes can "shed[]light" on later statutes).[31]

Accordingly, while the abbreviated text of later acts such as those passed in 1914 and 1926 did

not include the term "reservation," the later acts *are* properly read in conjunction with the earlier

acts to discern the clearest possible understanding of Congress's intent and policy purposes: that

all set-asides were "reservations."[32]

Subsequently, in the 1958 Rancheria Act, Congress expressed its intent to facilitate

"termination of the Federal trust relationship," to "reservation[s] or rancheria[s]." Reference was

made throughout the Act to the two designations without distinction being made between them.

*See* Rancheria Act, 72 Stat. 619-621 at §§ 2, 3, 5, 6, 10, 11; and 1964 Amendment, Stat. 390-91,

---

[30] Illustrative of this point is the fact that during debates over the Appropriation Acts in 1917 and 1920, lawmakers asked about the status of prior appropriations.  In both instances, although the specific bills being debated used the "homeless Indians" language that first appeared in the 1914 Act, the response on the floor was to report purchases beginning with the 1906 Act and including all subsequent related Appropriation Acts.  *See* 54 Cong. Rec. 2025, 2059 (Jan. 26, 1917) (statement of Sen. Curtis); 59 Cong. Rec. 1206, 1228 (Jan. 8, 1920) (statement of Rep. Snyder).

[31] Statutory provisions *in pari materia* are construed together to discern their meaning.  *Motion Picture Ass'n of Am., Inc. v. F.C.C.*, 309 F.3d 796, 801 (D.C. Cir. 2002); *see also Griffith v. Lanier*, 521 F.3d 398, 402 (D.C. Cir. 2008) ("[W]e read a body of statutes addressing the same subject matter *in pari materia,* as if they were one law, including later-enacted statutes as well."). The rule of *in pari materia* "is but a logical extension of the principle that individual sections of a single statute should be construed together, for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject."  *Erlenbaugh v. United States*, 409 U.S. 239, 244, 93 S. Ct. 477, 480, 34 L. Ed. 2d 446 (1972).

[32] In addition, the language of the subsequent Appropriation Acts is consistent with language Congress uses when creating Indian reservations.  Specifically, the Acts appropriate funds "[f]or the purchase of lands for the homeless Indians in California, including improvements thereon, and for the *use and occupancy* of said Indians."  *E.g.* 1914 Act at 461 (emphasis added).  For decades before it authorized funds for the purchase of the Rancheria, Congress has used the phrase "use and occupancy" (or variations thereon) when describing lands set aside as Indian reservations.  *See, e.g.*, Treaty between the United States of America and the Qui-nai-elt and Quil-leh-ute Indians, 12 Stat. 971 art. II (July 1, 1855) (describing reservation as lands "reserved[] for the use and occupancy of the tribes and bands aforesaid").  Congress also used this language during the allotment era when describing lands that were retained by a tribe.  *See, e.g.*, An act to provide for the opening of a part of the Colville Reservation, in the State of Washington, and for other purposes, 27 Stat. 62, 64 § 8 (July 1, 1892) (describing tribe's remaining land as "still reserved by the Government for their use and occupancy").  The executive branch, too, has long used the phrase "use and occupancy" when describing land set aside for Indian reservations.  *See, e.g.*, 2 C. Kappler, Indian Affairs: Laws and Treaties 687 (Sept. 4, 1902) (executive order by which land was "set apart as a reservation for the use and occupation of the Indians of the Nambe Pueblo).  Thus, the language of the Appropriation Acts providing funds for the purchase of the Rancheria is consistent with the language Congress uses when creating Indian reservations.

at §§ a, b, g.  Thus, examination of the past practices of Congress demonstrates that the

"established meaning" of "reservation" in IGRA encompasses California rancherias.

Similarly, the Department's practice has been to interpret "Indian reservation" broadly to

include rancherias.  The Department's Solicitor's Office long ago observed that "the Department

has [never] attempted to make a general definition of the term" reservation.  "Judicial and

Departmental Construction of the Words "Indian Reservation," (Dec. 29, 1945), *pub'd in* 2 Op.

Solic. on Indian Affairs 1378 (1979).[33]  This holds true today and the term continues to be a

broad one – "simply a convenient way of designating the tract."  *Id.*  When the Department *has*

defined "reservation" or "Indian reservation," those definitions often expressly include

California rancherias;[34] in fact, when the Department promulgated regulations governing gaming

eligibility determinations for lands acquired after enactment of IGRA, those regulations

provided, *inter alia*, that "[r]eservation means: . . . (l)and of Indian colonies and rancherias

(*including rancherias restored by judicial action*) set aside by the United States for the

permanent settlement of the Indians as its homeland."  25 C.F.R. § 292.2 (emphasis added).

Although not all of the Department's definitions of "reservation" *expressly include* rancherias,

---

[33] *See also* "Licensing Power of State over California Rancheria Dog Owners, M-28958 (Apr. 26, 1939), *pub'd in* 1 Op. Solic. on Indian Affairs 891 (1979) (describing rancherias as "for all practical purposes, small reservations" over which the State lacked regulatory authority).

[34] Congress can be presumed to have been aware of the following definition of "reservation" that included rancherias within its ambit, as it was promulgated prior to enactment of IGRA: 25 C.F.R. § 273.2(o) (Bureau of Indian Affairs regulations governing education contracts under the Johnson-O'Malley Act) ("'Reservation' or 'Indian reservation' means any Indian tribe's reservation, pueblo, colony, or Rancheria, including former reservations in Oklahoma, Alaska Native regions established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), and Indian allotments.")

Moreover, the Department has been consistent, promulgating the following regulations since IGRA was enacted: 25 C.F.R. § 101.1 (BIA regulations governing Loans to Indians from the Revolving Loan Fund) ("Reservation means Indian reservation, California Rancheria, public domain Indian allotment, former Indian reservation in Oklahoma, and land held by Alaska Native groups incorporated under the provisions of the Alaska Native Claims Settlement Act (85 Stat. 688), as amended."); 25 C.F.R. § 286.1 (same, for purposes of BIA regulations governing the Indian Business Development Program); 25 C.F.R. § 163.1 (BIA General Forestry Regulations) ("Reservation means any Indian reservation established pursuant to treaties, Acts of Congress, or Executive Orders and public domain Indian allotments, Alaska Native allotments, Rancherias, and former Indian reservations in Oklahoma.").

Plaintiff fails to identify a single definition (and the United States is not aware of any) that *expressly excludes* rancherias.

That the Department adopted a definition of "reservation" in the Part 292 regulations that expressly includes rancherias, including those restored by judicial action, is strong evidence that the deemed approval of the Compact Amendment was not "contrary to law."[35]  The Department's definition of reservation in IGRA (although in a slightly different context), is entitled to some level of deference, particularly where Congress has specifically delegated the authority to interpret the term to the Secretary.  *See* Congressional Clarification.  Further, any decision embracing Plaintiff's argument that the phrase "Indian reservation" in Section 2703(4) of IGRA *does not* include rancherias could have implications for the Part 292 regulations, because such a decision would suggest that there are inconsistent definitions of "reservation" throughout IGRA.  The text and legislative history of IGRA do not provide, nor does Plaintiff provide, any reason warranting such an absurd result, thus the Court should avoid such a result here.  *See Griffin v. Oceanic Contactors, Inc.*, 458 U.S. 564, 575 (1982) ("Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 37 (D.D.C. 2006) ("statutes must be interpreted, if possible, to avoid absurd results") (citing, *inter alia*, *Griffin*).

Further evidence of the Department's treatment of rancherias as reservations is found in the fact that, pursuant to the IRA's mandate that a vote be conducted on each "reservation" to give adult Indians thereon an opportunity to reject the IRA, 25 U.S.C. § 478, the Secretary held such a vote at the Buena Vista Rancheria.  *See* Haas Report at 15.  This election is dispositive

---

[35]The regulatory definition is not precisely implicated in this case because the Rancheria was a reservation at the time of IGRA's enactment, and Section 2719 of IGRA is not implicated.

evidence that the Rancheria was considered a "reservation" prior to its unlawful and ineffective Rancheria Act termination.  Another court considering the significance of such elections recognized that the absence of such an election leads to the reasonable conclusion that a group of Indians must not have had a reservation "home base" when the elections were conducted, at or around 1934.  *See Cnty. of Amador, Calif. v. U.S. Dep't of the Interior*, No. 212-cv-01710-TLN-CKD, 2015 WL 5813980, at *11 (E.D. Cal. Sept. 30, 2015).  The inverse must also be true – that the occurrence of such an election is evidence of the existence of a "reservation."

The Department's broad interpretation is also evident in the Department's Solicitor's Office concurrence in the NIGC Opinion.  That opinion analyzed the Appropriation Acts, the Rancheria Act and subsequent *Hardwick* Judgments, and relevant case law, and concluded that the Rancheria is a reservation, and thus, is Indian lands under IGRA.  While not a formally adopted opinion, and although it was authored after the deemed approval, it is, at a minimum, "'entitled to respect' under [the Court's] decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)."  *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (finding that interpretations such as opinion letters lacking the force of law are not entitled to full *Chevron*-style deference).  Under *Skidmore*, informal agency interpretations are "'entitled to respect' . . .  to the extent that those interpretations have the 'power to persuade.'"  *Id.* (quoting *Skidmore*, 323 U.S. at 140).  The degree of deference in such situations will "vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."  *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001).  The NIGC Opinion is at least entitled to the broadest respect available under *Skidmore* as a thoroughly analyzed and carefully reasoned legal opinion.  Thus, California rancherias fall within the "established meaning" of "Indian reservation" as that term is used by the Department

in furtherance of its Indian affairs authority. *See* 25 U.S.C. §§ 2, 9.

Likewise, Congress can be presumed to have been aware that courts too had defined reservation broadly, to encompass rancherias within that definition. Courts have consistently held that there are no talismanic words required for the establishment of an Indian reservation. Instead, "[i]t is enough that from what has been done there results a certain defined tract appropriated to certain purposes." *Minnesota v. Hitchcock*, 185 U.S. 373, 390 (1902). This proposition has already been accepted by this Circuit in regard to California rancherias.  *See City of Roseville II*, 348 F.3d at 1022 (explaining that "in 1917, the federal government provided the Auburn Tribe with a small 20–acre reservation … known as the Auburn 'Rancheria'").[36]

While there is no universal federal law definition of Indian reservation, Supreme Court precedent establishes that the term generally encompasses any tract of land set aside formally or informally by the federal government for use or occupancy of Indians.  *See, e.g., United States v. Celestine*, 215 U.S. 278, 285 (1909); *Hitchcock*, 185 U.S. at 390.  Indeed, the Supreme Court settled long ago in connection with the Reno Indian Colony that the reservation designation is not a requisite of reservation status:

> The fundamental consideration of both Congress and the Department of the
> Interior in establishing this colony has been the protection of a dependent people.
> Indians in this colony have been afforded the same protection by the government
> as that given Indians in other settlements known as "reservations." . . .  [It] is
> immaterial whether Congress designates a settlement as a "reservation" or
> "colony."

*United States v. McGowan*, 302 U.S. 535, 538-39 (1938).  Congress is presumed to have been aware of how courts had defined and interpreted reservation when it drafted IGRA.

---

[36] Courts have also recognized the validity of Indian reservations not created by any specific treaty, statute, or executive order.  *Sac & Fox Tribe of Miss. in Iowa v. Licklider*, 576 F.2d 145, 149-50 (8th Cir. 1978) (finding *de facto* reservation); *Tuscarora v. N.Y. Power Auth.*, 257 F.2d 885, 887 (2d Cir. 1958) (finding "Indian Reservation" from tract acquired by purchase by United States for tribe); *cf. Mattz v. Arnett*, 412 U.S. 481, 490, 93 S. Ct. 2245, 2250, 37 L. Ed. 2d 92 (1973) (finding that reservation, although not re-established by Executive Order or specific congressional action, continued in *de facto* existence.)

The D.C. Circuit has similarly concluded that the dictionary definition of "reservation" – a "tract of public land set aside for a particular purpose (as schools, forest, or the use of Indians)," – indicates that "the term 'reservation' has no rigid meaning." *Arizona Pub. Service Co.*, 211 F.3d at 1293 (citing Webster's Third New Int'l Dictionary 1930 (1993).  The court also noted that "nothing in the United States Code is to the contrary."  *Id.* (cataloguing numerous definitions of the term "reservation" within the U.S. Code).  As in that case, "the varying definitions of 'reservation' *lay to waste*" Plaintiff's argument that the Rancheria is not a reservation.  *Id.* (emphasis added).

The D.C. Circuit and many other courts have already found that rancherias are reservations.  *See Big Lagoon Rancheria v. California*, 789 F.3d 947, 951 n.2 (9th Cir. 2015); *Artichoke Joe's Cal. Grand Casino v. Norton*, 278 F. Supp. 2d 1174, 1176 n.1 (E.D. Cal. 2003) (describing rancherias as "small Indian reservations"); *Duncan v. United States*, 667 F.2d 36, 41 (Ct. Cl. 1981) (finding with respect to Robinson Rancheria that "Congress clearly contemplated that th[e] land have the same general status as reservation lands."), *cert. denied*, 463 U.S. 1228 (1983); *Governing Council of Pinoleville Indian Cmty. v. Mendocino Cnty.*, 684 F. Supp. 1042, 1046 (N.D. Cal. 1988) (finding against backdrop of termination and restoration history parallel to that of Buena Vista, intent "to restore all land within the original Rancheria as Indian Country and . . . to treat the entire Rancheria as a reservation.").[37]

Courts have also found that establishment of the rancherias equated to the establishment

---

[37] Plaintiff's attempt to distinguish these cases is unavailing.  Pl.'s Mem. Supp. Summ. J., 18-20.  Plaintiff disingenuously fastens upon history *subsequent* to the original set asides of the Auburn and Lytton Rancherias as reservations to argue that the Buena Vista Rancheria must today be in trust status to qualify as a reservation under IGRA (*City of Roseville II* and *Artichoke Joe's*); misreads the reference to "communities" in *Duncan v. United States* as a reference to the Robinson Rancheria land rather than its residents; and in connection with *Governing Council Pinoleville Indian Cmty.*, strains to distinguish between the various Appropriation Acts which must be read *in pari materia*.

of other reservations.  When originally set aside, "[s]ince the lands were held in trust, they could not be taxed by state or local authorities . . ., and the resident Indians had no power to convey title to the land to others.  The United States controlled the rancheria lands under the special fiduciary duty owed by the United States to the Indian people." *Table Bluff v. Watt*, 532 F. Supp. 255, 258 (N.D. Cal. 1981); *see also* 56 Cong. Rec. 3938, 3959 (Mar. 23, 1918) ("The Indians cannot sell the land which is now being purchased for them.  It is held in trust by the Government." (Statement of Sen. Curtis during debate on 1918 Act)).  The fact that legal title in the deeds to most of the rancherias was taken only in the name of the United States is not controlling for purposes of determining whether the rancherias were Indian reservations. *Duncan v. United States*, 667 F.2d 36, 41 ("While not expressly stating that the United States held the land as trustee, Congress clearly contemplated that this land have the same general status as reservation lands," and "Congress also intended that the Interior Department supervise this Indian property."); *see also Duncan v. Andrus*, 517 F. Supp. at 3 (noting that "legal title to the land remained in the United States, although it was acknowledged that the United States held [it] in trust for the California Indians").  Thus, courts have consistently held that the "established meaning" of the term Indian reservation includes California rancherias.

Correspondingly, the preeminent Indian law treatise defines reservation broadly to include rancherias. It explains that "reservation" means "land set aside under federal protection for the residence or use of tribal Indians, regardless of origin," or "federally protected Indian tribal lands without depending on any particular source."  Cohen's Handbook of Federal Indian Law, § 3.04, at 190-91 (Nell Jessup Newton ed., 2012) ("Cohen"). The rancherias, including Buena Vista, purchased as a result of the various Appropriation Acts were expressly purchased "for the use . . . of . . . Indians."  Appropriation Acts, *supra* at 6 n.9.  It is no surprise then that

Cohen describes rancherias as "small *reservations* created for the use of the California Indians." *Id.* at § 1.03[5]) 59 (emphasis added).

The overwhelming weight of authority – the past practices of Congress, the consistent practice of the Department and the courts, and the leading treatise in the field – all point to the same inexorable conclusion: the "established meaning" of the term "Indian reservation" includes California rancherias.

c. <u>Consistent with These Interpretations, Plaintiff Itself has Recognized the Rancheria as a Reservation</u>

The 2001 ISA, executed by Plaintiff[38] and the Tribe subsequent to the approval of the 1999 Compact, refers to the Rancheria as a reservation. In the Fourth Recital, Plaintiff and the Tribe agree that "the Tribe intends to open a Class III gaming and entertainment facility on Indian lands *within the Reservation*." *Id.* (emphasis added). Similarly, Section 1.1 describes the purpose of the 2001 ISA as addressing "certain off-*reservation* impacts," and Section 1.2 describes the "Project" as "a class III gaming and entertainment facility, a parking structure, and an access road and other non-gaming ancillary facilities on approximately 30 acres located *inside the Tribe's Reservation*." *Id.* (emphasis added). The 2001 ISA also uses the word "reservation" to describe law enforcement activities, § 2.2.2 (creating "Reservation Patrol Team"), and access roads, § 3.1 ("Buena Vista Road is the access route to the Reservation."). This demonstrates that, in 2001, Plaintiff not only viewed and treated the Rancheria as an Indian reservation, but also that it did so specifically in the context of IGRA.

This is consistent with Plaintiff's position of generally recognizing the Rancheria as an Indian reservation. For example, the plain language of the 1987 *Hardwick* Judgment

---

[38] The Amador County Board of Supervisors voted unanimously to approve the 2001 ISA; two members who voted in the affirmative remain on the Board today. *See* 2001 ISA.

demonstrates that the County intended to treat the Rancheria "as any other federally recognized Indian Reservation" for all purposes.[39] 1987 *Hardwick* J. § 2, D.  The County agreed that "all of the laws of the United States that pertain to federally recognized Indian Tribes and Indians shall apply to the plaintiff Rancheria and the Plaintiffs."  1987 *Hardwick* J., § 2, ¶ D.  "All of the laws" necessarily includes those statutes, regulations, and judicial rulings already in effect – including *Cabazon*, which was handed down three months before the 1987 *Hardwick* Judgment was entered – *and* future enacted laws, including IGRA.  There is no basis for carving IGRA or any other generally applicable federal Indian law out of the "all laws" language of the Judgment.[40]

        2.    <u>Plaintiff's Attacks on the Rancheria's Reservation Status are Meritless</u>

---

[39] Indeed, the County is precluded from arguing that the Rancheria is not a reservation. As the D.C. Circuit observed, although stipulated judgments are not actually litigated for preclusion purposes, "[p]reclusion is appropriate when the stipulation clearly manifests the parties' intent to be bound in future actions." *Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 384 (D.C. Cir. 2011) (citing *Otherson v. Dept. of J., I.N.S.*, 711 F.2d 267, 274 n.6 (D.C. Cir. 1983)). The "scope of preclusion by settlement arises from contract" and intent is measured by "ordinary contract principles." *Id.* (citing Wright & Miller, Federal Practice & Procedure, § 4443, n.21 (2d ed.)).  "Under general contract law, the plain and unambiguous meaning of an instrument is controlling." *WMATA v. Mergentime Corp.*, 626 F.2d 959, 960–61 (D.C. Cir. 1980). The language of the 1987 *Hardwick* Judgment is unambiguous: "[t]he Plaintiff Rancheria shall be treated by the County of Amador… as any other federally recognized Indian Reservation…."  Plaintiff had every incentive to litigate the status of the Rancheria because the land status would determine the rights and obligations of each party involved in the litigation; Plaintiff was free to litigate the extent of the Rancheria's boundaries, back taxes owed, future tax assessments, and other jurisdictional issues in the continuing *Hardwick* litigation. In fact, Plaintiff could have litigated the status of the Rancheria specifically with respect to gaming.  Plaintiff must have been aware in May 1987 that the Ninth U.S. Circuit Court of Appeals had held in February 1986 that the State and Riverside County lacked authority to regulate tribal gaming on two Southern California Indian reservations, *Cabazon Band of Mission Indians v. County of Riverside*, 783 F. 2d 900 (9th Cir. 1986), or that the U.S. Supreme Court had affirmed that decision, *Cabazon*, 480 U.S. 202, in February 1987 - three months before Plaintiff entered the 1987 *Hardwick* Judgment.  Additionally, Plaintiff's argument that the Judgment was only tax related is unavailing, *see* discussion *infra* at 35-36.

[40] Plaintiff agreed in the 1987 *Hardwick* Judgment that it would treat the Rancheria as "Indian Country." 1987 *Hardwick* J. at § 2, C. This was consistent with its answer to the *Hardwick* Second Amended and Supplemental Complaint admitting that "at least since 1970 [it had] recognized the Buena Vista Rancheria as 'Indian Country.'" Answer of Def.'s Amador Cnty. et. al. to Second Amend. Supp. Compl. at ¶21, *Hardwick*, No. C-79-1710 (N.D. Cal. 1979), *Hardwick* Docket No. 179.  Agreeing to this designation implies that Plaintiff recognized the Rancheria as a reservation, since the definition of "Indian Country," at 18 U.S.C. section 1151, states "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation."

Plaintiff makes no attempt to ground its theory that the Rancheria is not an IGRA-qualified reservation in IGRA itself.  Instead, Plaintiff resorts to tortured readings of the case law finding that rancherias *are* reservations.  Pl.'s Mem. Supp. Summ. J., 18-20.  And Plaintiff relies on contorted interpretations of the 1983 and 1987 *Hardwick* Judgments to argue that the Rancheria must be held in federal trust to qualify as a reservation, and since it is not held in trust, that the 1987 *Hardwick* Judgment has no present effect.  *Id*. 21-29.  Rounding out this rewriting of history, Plaintiff attempts to use an *inapplicable* Act from 1864 to negate Congress's intent as reflected in the Appropriation Acts.

      a.   <u>The 1864 Act has no Bearing on this case</u>

Plaintiff's claim that the Rancheria's status is controlled by an 1864 statute granting the President discretionary authority to establish four reservations within California must be rejected. Pl.'s Mem. Supp. Summ. J., 29-30; Cal. Indian Reservation Act of April 8, 1864, 13 Stat. 39. That claim results in the absurd proposition that the Act somehow permanently capped the allowable number of reservations in California at four, and since the Rancheria (and by logical extension, every other California rancheria) was not one of the four, it cannot today qualify as a reservation.  *Id*. at 29.  Plaintiff is wrong.  The 1864 Act was addressed to the President's authority to make reservations from the *public domain*.  *See, e.g. Karuk Tribe v. Ammon*, 209 F.3d 1366, 1375 (2000), *cert. den. Karuk Tribe of California v. U.S.*, 532 U.S. 941 (2001) (explaining that President Grant through executive order described the Hoopa Reservation as "withdrawn from public sale and set apart for Indian purposes").  Reservation of land from the public domain is entirely distinct from the private land purchases and set-asides of California rancherias authorized by Congress in the Appropriation Acts.  Indeed, these Appropriation Acts were exactly the "new Congressional action[s]" that Plaintiff incorrectly insists were required for the Rancheria to be reservation.  Pl.'s Mem. Supp. Summ. J., 30.  Not only would reading the

1864 Act in the manner advanced by Plaintiff call into question the long-accepted reservation

status of scores of other Indian rancherias in California, it would be contrary to the Indian canon

requiring the statute to be read in favor of the Indians.

     b.  The Appropriation Acts, as Illuminated by the Rancheria Act, Demonstrate that the
          Rancheria was Set Aside as a Reservation

       Plaintiff's further argument that the Rancheria does not qualify as an Indian reservation

because it was allegedly purchased with funds from one of the Appropriation Acts that did not

specifically contain the word "reservation," Pl.'s Mem. Supp. Summ. J. at 34-35,[41] also lacks

merit.[42]  Again, the series of Appropriation Acts must be read *in pari materia* and those that did

not specifically include the term "reservation," did include the significant "use and occupancy"

language.  Moreover, Plaintiff's contention is at odds with Congress's express definition of

"reservation" as including lands purchased for Indians.  *See* 25 U.S.C. § 461 (referring to

reservations created by "treaty or agreement with the Indians, Act of Congress, Executive order,"

as well as by "*purchase or otherwise*") (emphasis added). [43]

---

[41] Through this argument Plaintiff also seems to imply that historical presence is a necessary prerequisite to reservation status. See Pl.'s Mem. Supp. Summ. J., 32.  However, nothing in IGRA requires tribal historic presence in order to constitute "Indian lands," and Plaintiff cites to no authority that requires historic presence in the IGRA context. Furthermore, the tribe is a federally recognized tribe such that its tribal status is established for purposes under IGRA.

[42] As before, Plaintiff continues to assail the NIGC's Opinion for, *inter alia*, its reference to the initiating 1906 and 1908 Appropriation Acts, which Acts are *in pari materia* with the later Appropriation Acts, notwithstanding that the AR demonstrates that Plaintiff itself urged the Secretary to seek such an opinion.  AR000204.  Plaintiff also makes much of the fact that the judicially noticeable Opinion post-dates the deemed approval of the Compact Amendment, while Plaintiff improperly proffers a non-judicially noticeable post-decision "expert" report in an attempt to bolster theories that again, are legally irrelevant with no grounding in IGRA. *Id*. 32-36.

[43] The House debate over the 1914 Act demonstrates that the distinction between a "reservation" and land purchased for "homeless Indians" was merely semantic.  Asked why Congress was being asked to purchase land for homeless Indians, Rep. John Hall Stephens (D-Tex.) explained that "[t]here were no public lands in the State of California which were available to be laid off as reservations either by the President or through treaties. . . .  Therefore these Indians are called homeless Indians of California.  If they are to have any land at all, it must be purchased for them by the United States Government."  51 Cong. Rec. 3550, 3577-78 (Feb. 17, 1914).  There was no discussion whatsoever that these newly purchased lands would have any different legal status than the State's existing Indian reservations.  In fact, during debate over a subsequent Appropriation Act containing identical language, Sen. Charles Curtis (R-Kan.) explained: "The Indians cannot sell the land which is now being purchased for them.  It is held in trust by the Government."  56 Cong. Rec. 3938, 3959 (Mar. 23, 1918).

Plaintiff's theory that the Rancheria was not a reservation upon acquisition is also refuted by the Rancheria Act.  Again, that Act "facilitated the termination of the trust relationship between the United States and the Indian people on forty-one enumerated rancherias and reservations in California."  *Smith v. United States*, 515 F. Supp. 56 (N.D. Cal. 1978) ("*Smith*"). Throughout the Act the lands of the enumerated rancherias were referred to as rancherias and reservations.  Section 10(b), as amended, indicates that prior to termination, the United States held title to rancheria lands in "trust" for the Indians of the rancherias or subject to a "restriction against alienation."  Section 2(C) states that any grantee Indian who receives any rancheria property distributed to him under the Act "shall receive an unrestricted title to the property conveyed," further indicating that the property was held by the United States subject to a restriction.  Section 3(e) states that the "lands within the rancheria or reservation that are held by the United States for the use of Indians" may be exchanged for other lands by the Secretary "before the termination of the Federal trust."

The language in the Rancheria Act as amended, coupled with the United States' failure to fulfill its duties under the Act lead the Court in *Smith* to conclude that:

> Since these sections of the Act evidence Congressional intent to hold Rancheria lands in trust for the Indian people of the rancherias, as in fact was done, and to continue the land in such trust status until all requirements for termination under the Act are met and the lands actually distributed, the plaintiff's lands therein did not become subject to taxation.

*Smith*, 515 F. Supp. at 61.  The Court of Claims in *Duncan v. United States* similarly concluded that ". . . Congress created and maintained a trust involving Indian property – and then provided for its termination, while making clear that trust status was to continue until terminated . . . ." *Duncan v. United States*, 667 F.2d at 44.  Thus, through enactment of the Rancheria Act, Congress specifically ratified the reservation and trust status of all rancheria lands as they existed

33

prior to termination.  The language of the Rancheria Act coupled with court interpretation makes clear that the rancherias purchased under the Appropriation Acts were Indian reservations, title to which was owned by the United States in trust equivalent status for the Indian groups that occupied them, regardless of how formal legal title to the rancherias was denoted in the purchase deeds.[44]

c.  The *Hardwick* Judgments Reinstated the Rancheria's Pre-termination Reservation Status

Plaintiff's purposeful misinterpretation of the *Hardwick* Judgments are also unavailing. These woefully belated attacks on the validity of the 1987 *Hardwick* Judgment are also beyond D.C. Circuit's decision and remand, which assumed the validity of that Judgment.  *See Amador Cnty.*, 640 F.3d at 375-376.

However, Plaintiff is correct in the assertion that the *Hardwick* Judgments "did not in any way create Indian Reservations."  Pl.'s Mem. Supp. Summ. J., 21.  Rather, what Plaintiff misperceives or refuses to perceive, is that the *Hardwick* Judgments *restored* the Rancherias to the status they held prior to enactment and rescission of the Rancheria Act.  As the D.C. Circuit recognized, "the California Rancheria Act stripped the land of its reservation status . . . ." *Amador Cnty.*, 640 F.3d at 383.  Through the 1987 *Hardwick* stipulation, entered as a judgment in May of 1987, Docket 13, Exh. 3, Plaintiff accepted that the Buena Vista Rancheria was never lawfully terminated under the Rancheria Act.[45]  1987 *Hardwick* Judgment, at § 2, ¶ B.  The 1987

---

[44] Notably, during a 1918 Senate debate over Interior appropriations, including an appropriation for purchase of lands for the "use and occupancy" of "homeless Indians" in California, Sen. Charles Curtis (R-Kan.) explained that the Indian beneficiaries would not be able to dispose of lands so purchased without the approval of the United States: "The Indians cannot sell the land which is now being purchased for them.  It is held in trust by the Government."  56 Cong. Rec. 3938, 3959 (Mar. 23, 1918).

[45] Through entry into the 1983 *Hardwick* Judgment, the United States had already bound itself to the un-termination of the Rancheria, which operated to restore its prior reservation status subject to the agreed upon further boundary confirmation proceeding.  The United States remained a party to the litigation through these further proceedings, and while it apparently did not sign the 1987 Stipulation for Entry of Judgment confirming the restoration of the original reservation boundaries of the Buena Vista Rancheria, the United States, as a party to the litigation always considered itself bound by the terms of that Judgment. *See, e.g.*, Docket No. 33, Attach. B., NIGC Indian Lands Opinion (June

*Hardwick* Judgment further confirmed, by reference to the 1983 *Hardwick* Judgment and the

legal description of the Rancheria therein, that the original boundaries of the Rancheria were

restored, *id*., that all lands within those restored boundaries were again "Indian country," *id*. at

section 2, paragraph C, and that the Rancheria would be treated by Plaintiff and the United States

"as any other federally recognized Indian Reservation" to which "all of the laws of the United

States that pertain to federally recognized Indian Tribes and Indians shall apply." *Id*. at § 2, ¶ D.

Despite this unambiguously broad language, Plaintiff now asserts that the 1987 *Hardwick*

Judgment  is *limited* in scope such that it only addresses jurisdiction to tax the "federally

recognized Indian Reservation" known as the Buena Vista Rancheria.  Pl.'s Mem. Supp. Summ.

J., 25-28.  Plaintiff's proposition that there can be such a "single purpose" federally recognized

Indian reservation must be rejected.

The 1987 *Hardwick* Judgment was, after all, a continuation and finalization of the

agreements already reached between the plaintiff class and the defendants in the *Hardwick*

litigation.  That Judgment served to confirm the boundaries of the Rancheria.  Although Plaintiff

argues that it was tax specific, resolving the tax issues necessarily required agreement as to the

boundaries of the reservation for *all* jurisdictional purposes.[46]  In exchange for dismissal of the

action, Plaintiff agreed to recognize and restore the prior boundaries of the Rancheria and agreed

---

30, 2005), at 5 n.4.  T have reiterated this position in similar situations. *See* Letter from Michael Hoenig, General
Counsel, NIGC, to Leona. L. Williams, Chairperson, Pinoleville Pomo Nation, regarding Rancheria Gaming Status
(Sept. 28, 2015); Letter from Dana R. Jackson, Staff Attorney, NIGC, to Ms. Sara Drake, California Department of
Justice, regarding "Determination on California Land Purchased by the Picayune Tribe in 1996" (Dec. 3, 2001);
Letter from Derril B. Jordan, Associate Solicitor, Division of Indian Affairs, to Kevin K. Washburn, Esq., General
Counsel, NIGC, regarding Elk Valley Rancheria (March 2, 2000), all *available at* http://www.nigc.gov/general-
counsel/indian-lands-opinions (last visited Oct. 28, 2015). Had the United States objected to the 1987 Stipulation for
Entry of Judgment, it would have had to file either a Rule 59 motion to alter or amend judgment, or a Rule 60
motion for relief from a judgment.  In the 28 years since judgment was entered in accordance with the Stipulation,
the United States has done neither.

[46] Moreover, such a reading is belied by the language of the 1987 *Hardwick* Judgment, which by its express terms
makes applicable on the Rancheria "*all* of the laws of the United States that pertain to federally recognized Indian
Tribes and Indians" (emphasis added), and not just those laws related to taxation.

that the Rancheria was never "lawfully terminated under the Rancheria Act. *Id*. at § 2, ¶ B. 2. The Judgment does *not* state that the Rancheria was never lawfully terminated (and thus restored) *solely for taxation purposes*. Furthermore, the Judgment includes numerous provisions unrelated to taxes including boundary restoration, at section 2 paragraph C, and road maintenance, at section 2 paragraph H. Nothing in the structure of the Judgment indicates there is any limit to the scope of the provisions relating to recognition of the Rancheria as a reservation, the "un-termination" of the Rancheria, or the restoration of the boundaries. *See generally* 1987 *Hardwick* J. There is simply no basis for claiming that the provisions that came before the tax provisions in the Judgment were restricted to tax purposes.

Plaintiff now claims that the 1987 *Hardwick* Judgment reflects that it would forego further taxation "if, and only if" the Rancheria lands were placed in trust. Pl.'s Mem. Supp. Summ. J., 25. However, such language is nowhere to be found in the Judgment. Rather, section 2, paragraph G states that the "County may impose real property taxes on Indian owned Parcels that are not owned in trust by the United States of America, if the Indian Property owner has not filed within the tax year an exemption form with the county assessor establishing the property owners status as an Indian." Indian is defined, *inter alia*, as a member of a federally recognized tribe. Thus, contrary to Plaintiff's assertions, Plaintiff actually agreed not to tax any Indians that were members of a federally recognized tribe, which includes all of the Indians of the Rancheria, so long as they filed the appropriate exemption form.

Further seeking to undermine the 1987 *Hardwick* Judgment, Plaintiff seeks to disavow its stipulation to treat the Rancheria "as any other federally recognized Indian reservation" on the grounds that parties cannot stipulate to conclusions of law, and that "stipulated conclusions of law have no preclusive effect." Pl.'s Mem. Supp. Summ. J., 23-24. However, the case law

Plaintiff cites is inapposite, because each of these cases concern *pretrial stipulations of fact*.[47]

Plaintiff fails to cite a single case in which a *stipulated settlement*, subsequently entered as

judgment, was set aside because the parties had stipulated to a matter of law.  In fact, in settling

lawsuits, parties routinely stipulate to questions of law.[48]  If the Court finds those conclusions of

law to be erroneous, it will reject the stipulation; if not, the court enters judgment, and the parties

are bound by their agreement.  Any other rule would wreak havoc on the court system.

    d.  <u>Trust Status is not a Requisite of Reservation Status</u>

        Plaintiff also argues that the Rancheria can only be a reservation if it is acquired in trust

pursuant to the IRA.  Pl.'s Mem. Supp. Summ. J., 15-16.  This assertion finds no support in

IGRA's text, which defines "Indian lands" to include *all* land within the boundaries of an "Indian

reservation," 25 U.S.C. § 2703(4), and Plaintiff cites no case law to support its novel theory.[49]

        While Plaintiff is correct that pursuant to the 1983 *Hardwick* Judgment tribes could *elect*

to transfer their lands to the United States to be held in trust, nothing in that Judgment required

the Tribe here to do so in order to maintain its Rancheria's reservation status.  Indeed, the Tribe

---

[47] *Weston v. Wash. Metro. Area Transi Auth.*, 78 F.3d 682, 685 (D.D.C. 1996) (parties stipulated before trial as to which regulation governed; stipulation was in error, and court had authority to determine which regulation actually governed); *Tex. Instruments Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995) (parties' Agreed Stipulation of Fact before bankruptcy court contained error as to a matter of law in advance of summary judgment motion); *Koch v. Dep't of the Interior*, 47 F.3d 1015, 1018 (10th Cir. 1995) (parties' stipulation in advance of hearing before administrative law judge contained an error of law); *In re Lawson Square, Inc.*, 816 F2d 1236, 1240-41 (8th Cir. 1987) (parties stipulated before trial concerning nature of security on a loan; court reviewed because stipulation governed what statute would control).

[48] *E.g.*, *Perry v. Gotbaum*, 766 F. Supp. 2d 151 (D.D.C. 2011) (stipulating to release of liability); *Vista Healthplan, Inc. v. Bristol-Myers Squibb Co.*, 266 F. Supp. 2d 44 (D.D.C. 2003) (stipulating to class action settlement).

[49] In fact, contrary to Plaintiff's assertions, the case law holds that there is no requirement that a reservation must be held in trust.  *See, e.g., Indian Country, U.S.A. v. Oklahoma*, 829 F.2d 967, 975-76 (10th Cir. 1987) (noting fee title is "not an obstacle to . . . reservation . . . status").  Further, Cohen explains that "reservation" has meant any land reserved for tribe "regardless of the form of tenure," and has been applied to individual and unrestricted lands. Cohen, § 3.04at 190 n.64.  Indeed, in the late nineteenth century, Congress embarked on a policy to divide up Indian reservations into small parcels or allotments.  *See* Cohen, § 1.04 at 71-79.  Prior to Congress's reversal of the allotment policy through the IRA, many reservations were heavily allotted.  *Id.*  However, a "reservation" is determined by the existence of its boundaries, and the status of land within a reservation's boundaries (i.e., fee, trust, restricted fee) is simply not relevant to the issue of whether a reservation exists.  *Solem v. Bartlett*, 465 U.S. 463, 470 (1984).

had no reason to believe that trust status was needed, as the County and the United States had already agreed, and the district court had already entered judgment requiring, that they would treat the Rancheria in the same manner as "any other federally recognized Indian reservation" and as "Indian country."  Further, nothing in the language of the 1983 *Hardwick* Judgment prevents the Tribe from gaining trust status after 1988.  And, contrary to the County's contention, there is no deadline for tribes to transfer lands into trust.  Pl.'s Mem. Supp. Summ. J., 25.

      e.   <u>Plaintiff's injury assertions are improper and irrelevant</u>

Plaintiff's assertions regarding the harms it would suffer from the gaming contemplated in the Compact Amendment are not properly before the Court and are irrelevant to the legal issues on remand.  Plaintiff claims that gaming on the Rancheria would be an intrusion on its jurisdiction.  Pl.'s Mem. Supp. Summ. J., 37-38.  Plaintiff offers as "evidence" of its jurisdiction a letter from the County Planning Department stating that the Rancheria has been zoned single-family residential and agricultural.  Docket No. 79-5.  This letter is not properly before the Court, because it is outside the AR, and because Plaintiff has not demonstrated that it meets the requirements for consideration of extra-record evidence.  Even if it is properly before the Court, the letter is not material, and therefore cannot serve as a basis for summary judgment.  The County's mere assertion that is has zoning authority over the Rancheria – an assertion made some three years after Plaintiff initiated this litigation – does not make it so.

In addition, Plaintiff bemoans the impacts of gaming and argues that the Compact Amendment's mitigation measures do not adequately protect the County.  Pl.'s Mem. Supp. Summ. J. at 38-40.  Plaintiff offers as "evidence" the declarations of three County officials. Docket Nos. 79-6—79-8.  These declarations are not properly before the Court for the same reasons that the Beckham Materials are not properly before the Court, i.e., they are extra-record

evidence not properly before the Court in an APA case, and they were served upon Defendants

without notice and without affording Defendants an opportunity to test the statements therein.  In

addition, they do nothing to assist the Court in determining whether the Rancheria is an "Indian

reservation" as that term is used in IGRA and, therefore, they are immaterial and not a proper

basis for summary judgment.  Finally, as the Declarants themselves acknowledge (and as the

record in this case demonstrates), Plaintiff negotiated an Intergovernmental Services Agreement

with the Tribe after the 1999 Compact, and had ample opportunity to negotiate a similar

agreement regarding the Compact Amendment, but made a deliberate and strategic choice not to

do so.  *See* Docket No. 40-1.

Ultimately, Plaintiff's arguments demonstrate that the real goal of this litigation is not to

ensure that gaming on the Rancheria is conducted in accordance with IGRA, but rather, to

prevent gaming from taking place on the Rancheria.  That ship has sailed.  IGRA is law, and

Plaintiff cannot exempt itself from IGRA's reach.

> B.   Even if the Rancheria is not an "Indian reservation" and, thus, not "Indian lands," the United States is Entitled to Summary Judgment Because IGRA does not Prohibit the Secretary from Approving a Compact for Land that is not yet Indian Lands.

Without citation to a particular provision of IGRA, Plaintiff asserts that the Secretary is

precluded from approving a tribal state compact without first making a determination that the

"site is 'Indian land' within the meaning of IGRA."  First Amended Compl. ¶ 33.  Plaintiff has

waived this argument, because it speaks to the *process* of the deemed approval, not to whether

the *substance* of the deemed approval was "contrary to" IGRA.  *See Amador Cnty.*, 640 F.3d at

382.

Moreover, this argument fails on the merits.  IGRA does not require the Secretary to

render Indian lands opinions in connection with compact approval.  *See generally* IGRA, 25

U.S.C. §§ 2701-2721 (providing deadline for Secretarial approval of compacts, but *not* requiring an Indian lands determination before such approval).[50]  No provision of IGRA either expressly or impliedly prohibits the Secretary from approving a compact for anticipated Indian lands. Indeed, compacts have been approved before Tribes have any land.  *See, e.g.*, Exh. 2, Letter from Kevin K. Washburn, Ass't Sec'y–Indian Affairs, to Hon. William B. Iyall, Chairman, Cowlitz Indian Tribe at 2-3 (July 31, 2014) (approving compact despite land not yet being in trust); at 3 n.7 (collecting prior examples of same).  In the instant case, the Compact Amendment took effect by virtue of the Secretary's inaction within the statutory period.  If the Secretary has discretion to take no action at all on a submitted compact, it follows *a fortiori*, that the Secretary has no duty to render an Indian lands opinion in connection with such inaction.

Contrary to Plaintiff's assertions, the Compact Amendment does not provide for gaming that is "contrary to" IGRA, because it only allows gaming "on Indian lands within the boundaries of [the] rancheria."  Compact Amendment section 4.3.5.  In other words, the Compact does not say that the Rancheria *is* Indian lands, it provides for gaming on whatever Indian lands exist within the boundaries of the Rancheria.  Plaintiff concedes as much: "the 2004 Compact permits gaming only on 'Indian lands' as defined by IGRA . . . [t]hus, IGRA's statutory limitation on land upon which gaming may occur is in both the federal law and the 2004 Compact."  Pl.'s Mem. Supp. Summ. J., 17.

This is critical to any consideration of remedy by this Court.  *If* the Court determines that the Rancheria is not an "Indian reservation" as that term is used in the IGRA, and therefore that

---

[50] While § 2710(d)(8)(A), dealing with compact approval through an affirmative determination, authorizes the Secretary to approve any tribal state compact governing gaming on "Indian lands of such Indian tribe," it does not mandate that the Secretary undertake an analysis of whether the gaming will take place on Indian lands.

In addition, here the AR reflects that the Plaintiff itself understood that the Secretary does not undertake Indian Lands Opinions in the course of reviewing a submitted compact, as it too urged that the NIGC be asked to render an Indian lands opinion. *See* AR000204.

the Rancheria is not *now* eligible for gaming pursuant to IGRA, the appropriate remedy is not, as Plaintiff suggests, an order that the Secretary's deemed approval of the Compact Amendment is null and void.  Rather, the appropriate remedy should be limited to declaratory relief that the Rancheria does not presently qualify as Indian lands, and that no gaming may commence unless and until some or all of the lands within the Rancheria are either taken into trust or into restricted fee status by the United States, thus rendering them "Indian lands" under 25 U.S.C. § 2703(4)(B).

       C.      <u>Plaintiff's Remedy is Inconsistent with IGRA</u>

Even if this Court determines that the Compact Amendment illegally authorizes gaming on lands that are not yet "Indian lands," and therefore that the Secretary's deemed approval was "contrary to" IGRA, Plaintiff's proposed remedy – an order setting aside as unlawful the deemed approval – is itself inconsistent with IGRA.  The appropriate remedy is suggested in the very provision of IGRA that provides for deemed approvals, specifically, that a compact so approved is approved "only to the extent that the compact is consistent with the provisions of this Act."  25 U.S.C. § 2710(d)(8)(C).  Thus, in the event that Plaintiff is entitled to summary judgment, the appropriate remedy would be declaratory judgment that (1) the Rancheria is not, at the time of the Court's order, "Indian lands" qualified for gaming, and (2) that no gaming pursuant to the Compact may occur on the Rancheria unless and until such lands are made "Indian lands" eligible for gaming.  Such a remedy would respect IGRA by ensuring that gaming does not occur on lands that are not "Indian lands," while also respecting the rest of the agreement (including provisions for regulation of gaming, revenue sharing, health and safety, etc.) entered into voluntarily by two sovereigns (the State and the Tribe).

IV.     CONCLUSION

Plaintiff has gone to great lengths to distract this Court from the relatively simple issues it must address.  First, is the Rancheria an "Indian reservation" *as that term is used in IGRA*?  Plaintiff argues generally that "reservation" has a narrow meaning that does not encompass California rancherias generally and the Buena Vista Rancheria in particular.  However, those arguments find no support in Congressional practice, the Department's practice, or the case law – and, most important, those arguments do nothing to inform the Court as to what Congress intended when it used the term "Indian reservation" *when it enacted IGRA*.  The overwhelming weight of authority supports a conclusion that the Rancheria is, in fact, an "Indian reservation" as that term is used in IGRA and, therefore, that it is "Indian lands" eligible for gaming.  Consequently, the Secretary's deemed approval of the Compact Amendment was not "contrary to" IGRA, and Defendants are entitled to summary judgment.

Even if the Rancheria is not "Indian lands," the Compact Amendment *did not* generally authorize gaming within the boundaries of the Rancheria; rather, it authorized gaming only on *Indian lands* within the boundaries of the Rancheria.  Therefore, the Secretary's deemed approval of the Compact Amendment was not "contrary to" IGRA, and the United States is entitled to summary judgment.

Finally, even if the Secretary's deemed approval of the Compact Amendment is "contrary to" IGRA, the appropriate remedy *is not* to void the deemed approval.  Rather, the appropriate remedy is declaratory judgment that the lands within the boundaries of the Rancheria are not now Indian lands, and that gaming pursuant to the Compact Amendment cannot occur on those lands unless and until those lands qualify as "Indian lands" for purposes of IGRA.

Dated: October 30th, 2015

Respectfully Submitted,
JOHN C. CRUDEN,
Assistant Attorney General

  /s/ *Judith Rabinowitz*
JUDITH RABINOWITZ
Trail Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Indian Resources Section
301 Howard Street, Suite 1050
San Francisco, California  94105
Phone:  (415) 744–6486
Fax:  (415) 744-6476
Judith.rabinowitz2@usdoj.gov

Of Counsel:
Daniel Lewerenz
U.S. Department of the Interior
Office of the Solicitor